UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GENNADIY M. DOMNISTER, VLADISLAV
SITNIKOV, VLADIMIR MICHENKO, EDUARD
LERNER, EDUARD MURKAMETDINOV, AND
ALEUSANDR YULDASHEV, on behalf of themselves
and others similarly situated,

                   Plaintiffs,                             MEMORANDUM & ORDER
                                                            03-CV-1666 (NGG)

     v.

EXCLUSIVE AMBULETTE, INC., EXCLUSIVE
AMBULETTE, d/b/a EXCLUSIVE
TRANSPORTATION SERVICES, EXCLUSIVE
TRANSPORTATION SERVICES, SUSAN
EDELMAN, MICHAEL EDELMAN, DAVID H.
GREENBAUM, SERVICE EMPLOYEES
INTERNATIONAL UNION, AFL-CIO, CLC,
SERVICE EMPLOYEES INTERNATIONAL UNION,
SERVICE WORKERS OF AMERICA, TCU,
LOCAL 455, AFL-CIO, CLC, and JOSEPH PECORA,

                   Defendants.
-------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

    This civil action is brought on behalf of Plaintiffs Gennadiy M. Domnister ("Domnister"),

Vladimir Mishchenko ("Mishchenko"), Edouard Murkametdinov ("Murkametdinov"), Vladislav

Sitnikov ("Sitnikov"), and Aleksandr Yuldashev ("Yuldashev") (collectively, "Plaintiffs"),[1] who

are former employees of Defendant Exclusive Transportation Services ("ETS"). Plaintiffs are all

of Eastern European descent. Plaintiffs were represented during their course of employment at

ETS by Defendant United Service Workers, Local 455, IUJAT ("Union"). Defendant Joseph

Pecora ("Pecora") was Plaintiffs' union representative. ETS is owned and operated by

---

[1] Plaintiff Eduard Lerner settled and is no longer a party to this case.

1

Defendants Susan Edelman, Michael Edelman, and David H. Greenbaum ("Greenbaum"). Defendant Exclusive Ambulette ("EA") is another company also owned by Susan Edelman.

Plaintiffs filed suit against ETS, EA, Susan Edelman, Michael Edelman and Greenbaum (collectively, "Exclusive Defendants"), and against the Union and Pecora (collectively, "Union Defendants") claiming that they should have received the same terms and conditions of employment as EA employees. Specifically, they allege that: 1) Union Defendants breached their duty of fair representation by failing to urge ETS to apply the terms of the EA collective bargaining agreement ("CBA") to ETS employees; 2) Exclusive Defendants retaliated against Plaintiffs for their participation in Union activities in violation of the National Labor Relations Act ("NLRA"); 3) Exclusive and Union Defendants discriminated against Plaintiffs on the basis of their Russian national origin by breaching the terms of the EA CBA in violation of New York State Human Rights Law ("NYSHRL"); 4) Exclusive Defendants retaliated against Plaintiffs in violation of NYSHRL for complaining about the different terms and conditions of their employment; 5) Exclusive and Union Defendants discriminated against Plaintiffs on the basis of their Russian national origin by breaching the terms of the EA 1998 CBA in violation of New York City Administrative Code ("NYCAC"); and, 6) Exclusive Defendants retaliated against Plaintiffs in violation of NYCAC for complaining about the different terms and conditions of their employment. As explained *infra*, claims three and five are preempted by Section 301 of the Labor Management Relations Act ("LMRA") and, along with claims one and two, constitute federal causes of action.

Before this court is a motion for summary judgment on all claims brought by Exclusive Defendants and Union Defendants. For the reasons set forth below, the motion for summary

judgment is GRANTED with respect to claims one, two, three, and five. Claims four and six are referred to the state courts for adjudication.

## I. Factual Background

Before setting forth the relevant facts, I note that when deciding a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). Even in a fact-intensive case, however, the court will not accept as fact mere allegations lacking evidentiary support. Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001).

## Defendants

Defendant EA is engaged primarily in the business of transporting elderly persons between their residences and doctor's offices, clinics, and other health-care facilities, and maintains its place of business in Far Rockaway, New York. (Michael Edelman Affirmation ("M. Edelman Aff.") ¶¶ 3, 4; Susan Edelman Affirmation ("S. Edelman Aff.") ¶¶ 2, 3). Defendant Susan Edelman is the sole shareholder of EA, and Defendant Michael Edelman is the Vice President of EA. (M. Edelman ¶ 2; S. Edelman ¶¶ 2, 4.) Michael Edelman is responsible for, among other things, the day to day operations of EA, including its human-resources and labor-relations functions.[2] (M. Edelman ¶ 5.) He never supervised the employment of any

---

[2] Plaintiffs purport to deny this statement and claim that David Greenbaum was, in fact, the Vice President. (See Plaintiff's Responses to Exclusive Defendants' Rule 56.1 Statement ("Plaintiffs' First Responses") ¶ 5.) Plaintiffs rely on an arbitration award letter sent to Alexander Friedman (see Friedman Aff. Ex. 2). At most, however, this letter is evidence that David Greenbaum held the title of "Sr. Vice President" of EA and that he had responsibilities

3

Plaintiffs. (M. Edelman ¶ 12.)

Defendant Union represented EA's employees; specifically, Defendant Pecora was the business agent who, as of 2001, was the EA representative. (M. Edelman Aff. ¶ 7; Pecora Affirmation submitted by Exclusive Defendants ("Pecora Aff.") ¶¶ 3-4; Pecora Affirmation submitted by Union Defendants ("Pecora Second Aff.") at ¶¶ 3-4.)

Defendant ETS began operations in November 1998 and was engaged primarily in the business of transporting elderly persons to and from adult day-care facilities on a pre-determined route.[3] (Greenbaum Affirmation submitted by Exclusive Defendants ("Greenbaum Aff.") ¶¶ 4, 5.) At the outset, the majority of drivers hired by ETS had been previously employed by Park Shore Nursing Home and its adult day-care centers. (Id. at ¶¶ 5, 6.) Exclusive Defendants claim that ETS began its operations with forty drivers (id. at ¶ 6), while Plaintiffs assert that ETS began with twelve to fifteen drivers (Greenbaum Dep. at 13.)

ETS was owned and operated by YMF Limited Liability Company ("YMF"), and Susan Edelman was the sole member. (S. Edelman Aff. ¶ 5.) Defendants claim that Defendant Greenbaum was the Senior Vice President of ETS, in charge of, among other things, the day-to-day operation of ETS, including the human resources and labor relations functions of ETS. (Greenbaum Aff. ¶¶ 2, 7; S. Edelman Aff. ¶ 6.) Plaintiffs assert that Greenbaum was the Senior

---

related to human resources and/or labor relations. Plaintiffs present no evidence that suggests Michael Edelman was not a vice president and did not have similar responsibilities to Greenbaum.

[3] The parties dispute the composition of passengers transported by ETS drivers. Defendants claim that the passengers were almost exclusively Russian speakers (Greenbaum Aff. ¶ 4), while Plaintiffs assert that they transported both Russian- and English-speaking passengers (Murkamedinov Aff. ¶ 6; Domnister Dep. at 165-66; Alex Edelman Deposition ("A. Edelman Dep.") at 37).

Vice President of EA and that Plaintiffs were employees of EA. (Alex Friedman Affirmation ("Friedman Aff.") ¶ 8, Ex. 2.) The parties agree that ETS had an office at 945 East 108th Street in Brooklyn, New York, although Defendants contend that this was its exclusive place of business (Greenbaum Aff. ¶ 3; S. Edelman Aff. ¶ 5), whereas Plaintiffs allege that the official address was in Far Rockaway. (Greenbaum Aff. Ex. A; Friedman Aff. Ex. 2).

ETS employees were represented by the Union. (Greenbaum Aff. ¶ 11.) Defendants claim that Charles Shimkus ("Shimkus"), a business agent for the Union, organized the ETS employees and obtained a majority of their signatures on Union authorization cards. (Shimkus Aff. ¶ 8.) Plaintiffs claim that Greenbaum had asked employees to sign union cards and submitted the cards to the Union and that Shimkus did not organize the employees in any way. (Greenbaum Dep. at 26-27, 35.) As of 2002, Pecora served as the Union's business agent. (Pecora Second Aff. ¶ 5.) According to Plaintiffs, there was never a Shop Steward at the Brooklyn location. (Friedman Aff. ¶ 3.)

Plaintiffs Domnister, Mishchenko, Murkametdinov, Sitnikov, and Yuldashev are former drivers who were employed by ETS.[4] (Greenbaum Aff. ¶ 10.) Alexander Friedman ("Friedman") was employed by EA "and worked at its Brooklyn loccation [sic]" until terminated on January 29, 2002. (Friedman Aff. ¶¶ 1, 9.) He filed a grievance related to his termination,

---

[4] Defendants assert that Domnister was born in the Chukotka region of Russia (Domnister Dep. at 8), Mishchenko was born in Kiev, Ukraine and is of Ukranian ethnicity (Mishchenko Dep. at 6, 51-52), Murkametdinov was born in Uzbekistan and is of Tatarin ethnicity (Murkametdinov Dep. at 7, 42), Sitnikov was born in Latvia (Sitnikov Dep. at 8), and Yuldashev was born in Uzbekistan and is of Uzbek ethnicity (Yuldashev Dep. at 7, 39-40). Plaintiffs allege that they are all of Russian ethnic origin, all speak only Russian, consider themselves to be Russian, and were considered by their employer to have been Russian. (Sitnikov Aff. ¶ 13; Murkametdinov Aff. ¶ 3; Yuldashev Dep. at 39.)

5

and received an arbitration decision on July 10, 2002. (Id. at Ex. 2 (arbitrator's decision).)

**EA CBA**

The first CBA covering EA's employees was effective by its terms from January 1, 1998 until December 31, 2000 ("EA 1998 CBA"). (M. Edelman Aff. ¶ 8; A. Edelman Aff. ¶ 2.) Alex Edelman negotiated the EA 1998 CBA on behalf of EA, and Shimkus negotiated on behalf of the Union. (A. Edelman Aff. ¶ 2; S. Edelman Aff. ¶ 7; Shimkus Deposition ("Shimkus Dep.") at 12-13.) Pecora was responsible for administering the EA 1998 CBA and handling other bargaining unit issues arising between EA and its drivers employed at the EA Far Rockaway facility. (Shimkus Aff. ¶¶ 6, 7; Pecora Aff. ¶ 4.) Article 22A of the EA 1998 CBA provided that the CBA "shall be binding upon the parties hereto, their successors and assigns, and shall apply to all establishments now or hereafter owned, operated or controlled by the Employer." (M. Edelman Aff. Ex. A ¶ 22.)

A second CBA covering the drivers was subsequently negotiated between the Union, represented by Pecora, and EA, represented by Michael Edelman ("EA renewal CBA"). (Pecora Second Aff. ¶ 18.) The EA renewal CBA was effective from January 1, 2001 until December 31, 2003. (Id.)

Defendants allege that as of January 31, 1999, EA employed fifteen bargaining unit employees covered by the EA 1998 CBA and that eight of the fifteen were born outside of the United States. (M. Edelman Aff. ¶ 11, Ex. C.) Plaintiffs claim that all of the workers at EA were American-born.[5] (A. Edelman Dep. at 13-14.)

---

[5] Plaintiffs also claim that EA hired twenty employees covered by the EA 1998 CBA but provide no citation to the record. (Plaintiffs' First Response at ¶ 41.) Therefore, the court deems Defendants' statement that only fifteen EA employees were covered by the CBA to be true. See

**ETS 1999 CBA**

A CBA was negotiated between Alex Edelman, representing ETS, and Shimkus, representing the Union, to cover ETS employees, effective from February 1, 1999 until January 31, 2002 ("ETS 1999 CBA"). (Greenbaum Aff. ¶ 12; A. Edelman Aff. ¶ 3.) Plaintiffs assert that no Union representative signed an agreement on their behalf and that the agreement which purportedly applied to ETS employees referred to a Far Rockaway location and not to Brooklyn. (Greenbaum Aff. Ex. A; Friedman Aff. ¶ 3.) During the negotiations, Shimkus never proposed that ETS employees should be or were required to be covered by the EA 1998 CBA, and there was never a discussion about Article 22A of the EA 1998 CBA or the national origins or places of birth of ETS employees. (A. Edelman Aff. ¶¶ 4, 5.) Defendants claim that Plaintiffs did not file a grievance claiming any alleged breach of the CBA while employed by ETS. (Greenbaum Aff. ¶ 65; S. Edelman Aff. ¶ 10; Pecora Aff. ¶ 14; Shimkus Dep. at 51; M. Edelman Aff. ¶ 15; A. Edelman Aff. ¶ 9.) Plaintiffs allege that they complained to the Union. (Mischenko Aff. Ex. 1; Friedman Aff. ¶ 11, Ex. 3.)

In January 2002, Pecora became the Union business agent responsible for administering the ETS 1999 CBA and handling other bargaining unit issues arising between ETS and its drivers. (Shimkus Aff. ¶ 11; Pecora Second Aff. ¶ 5.) In late December 2002 and early January 2003, Pecora met with ETS employees to discuss upcoming negotiations for the second CBA between ETS and the Union, but none of the employees was interested in forming a negotiating committee. (Pecora Second Aff. ¶ 19.) Pecora, representing the Union, negotiated the ETS

---

Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

renewal CBA with Greenbaum, the ETS representative.[6]  (Id.)

**Plaintiff Domnister**

Domnister was initially hired by ETS in or about November 1998.  (Greenbaum ¶ 23;
Domnister Dep. at 14.)  In or about March 2001, Domnister volunteered to be laid off from ETS,
because ETS was having financial difficulties.  (Greenbaum Aff. ¶ 24; Domnister Dep. at 25.)
He returned to work in or about September 2001.  (Greenbaum Aff. ¶ 25; Domnister Dep. at 25.)

In the summer of 2002, Domnister found the pay stub of an EA driver in one of the vans.
The pay stub indicated that the EA driver had worked for fewer hours than the ETS drivers were
required to work and had been compensated at a higher rate than the ETS drivers.  (Domnister
Tr. at 176-77, 181.)  The ETS drivers discussed the "issue of being immigrants in this country
and the issue of being treated differently because [they] didn't know the country well."  (Id. at
176.)  Domnister asked Greenbaum about why the EA drivers earned more money for fewer
hours.  Greenbaum replied, "If I pay them any less money, they simply wouldn't show up for
work," and "I pay you less because I give you more hours."  (Id. at 177.)

In November 2002, Domnister received a copy of the EA 1998 CBA from Alexander
Friedman, a former employee of ETS, who had received the CBA from the union.  Prior to that
time, he had not known that a CBA existed.  (Domnister Dep. at 34; Friedman Aff. ¶ 5.)  He

---

[6]  Plaintiffs state that "before they brought a copy of the agreement, they did not know of
the Union's existence and there was no presence, and by 2003, all the employees who were
interested in the needs of the employees working in Brooklyn had been terminated and the union
did nothing and the remainders were afraid."  (Plaintiffs' Responses to the Union Defendants'
Rule 56.1 Statement of Undisputed Material Facts ("Plaintiffs' Reply to Union 56.1 Statement")
¶¶ 34-39.)  This reply to Union Defendants' 56.1 statement is so vague as to be nearly
incomprehensible.  Furthermore, it is not clear what relevance this has to the CBA negotiations.
Lastly, Plaintiffs have failed to provide any citation to the record.  Consequently, the court
accepts Defendants' statements as true.  See Giannullo,  322 F.3d at 140.

brought the copy of the EA 1998 CBA to Greenbaum and stated that he believed he should receive the same terms and conditions of employment as the EA employees since he was employed by EA.[7] (Greenbaum Aff. ¶ 28.) Greenbaum replied that Domnister was an ETS employee and not an employee of EA and that the CBA therefore did not apply to him. (Id.)

Domnister did not have a valid passenger endorsement on his driver's license beginning in early October 2002, and he was cautioned that if he did not resolve the issue, he would be suspended from working as a driver. (Greenbaum Aff. ¶ 27; Domnister Dep. at 140, 142, 158-59.) On November 26, 2002, Greenbaum informed Domnister that if he did not provide Greenbaum with a valid endorsement by December 4, 2002, Domnister would be suspended as a driver. (Greenbaum Aff. ¶ 29.) Domnister did not obtain the endorsement by December 4, 2002. (Greenbaum Aff. ¶ 31; Domnister Dep. at 54-55.) Domnister claims to have done everything that was required of him in order to get his endorsement, including passing medical tests.[8] (Domnister Dep. at 157-58.) On December 4, 2002, Domnister was suspended from driving for ETS. (Greenbaum Aff. ¶¶ 30-31; Domnister Dep. at 52-55.)

On the evening of December 10, 2002, Domnister met with Pecora to complain that he wanted the terms set forth in the EA renewal CBA to apply to the other drivers employed by ETS, and that the failure to do so was discriminatory. (Pecora Second Aff. ¶ 6.) Pecora replied that the ETS drivers were covered by the ETS 1999 CBA while EA drivers were covered by the

---

[7]Greenbaum states that Domnister brought the copy of the EA 1998 CBA to him in mid-October 2002. (Greenbaum Aff. ¶ 28.)

[8]Plaintiffs claim that because Greenbaum implied that he could help another employee obtain a TLC license (Greenbaum Dep. at 45-49), he could have assisted Domnister in resolving any issues he had with respect to his passenger endorsement. (Plaintiffs' Reply to Union 56.1 Statement ¶ 2.)

terms of the EA renewal CBA. (Id.) Defendants contend that Pecora then explained that ETS and the union were soon going to begin negotiations for a renewal CBA and suggested that Domnister become a shop steward and participate in the negotiations. (Id. at 7.) Plaintiffs allege that Pecora did not discuss with Domnister anything related to an ETS renewal CBA or the potential to become a shop steward. (Domnister Dep. at 146-47.)

Domnister contends that he spoke with Greenbaum about the EA 1998 CBA again on December 17 or 18, 2002, and asked why the employees were never given a copy of it; Greenbaum replied that the employees had never asked for it. Domnister then told Greenbaum that the employees never knew that it existed, and Greenbaum replied that that was Domnister's problem. (Domnister Dep. at 62.)

On December 19, 2002, Domnister met with Greenbaum again and asked if he had been fired. Defendants assert that Greenbaum told Domnister that he was not fired and that Domnister could return to work if he produced an abstract indicating that he had a valid passenger endorsement. (Greenbaum Aff. ¶ 33.) Plaintiffs contend that Greenbaum did not make any statement regarding the endorsement, but merely told him to wait and see. (Domnister Dep. at 63.) Domnister then called Pecora and told him that he had been laid off by ETS. (Pecora Aff. ¶ 8.)

Pecora wrote a letter to Domnister dated December 20, 2002, concerning the alleged lay-off with a Union grievance form enclosed. (Id. ¶ 9.) Domnister did not reply and did not return the grievance form. (Id. ¶ 10.) Pecora again wrote to Domnister by letter dated January 13, 2003 and enclosed an additional grievance form, but Domnister did not reply. (Id.)

Plaintiffs allege that Domnister had made appointments to see Pecora to discuss his

10

termination, but Pecora did not keep the appointments, and that Domnister called Pecora, but Pecora never returned the phone calls. Consequently, Domnister concluded that the Union would not help him. (Domnister Dep. at 149-50, 153, 175-76.) Domnister received the first grievance form but did not fill it out because he needed help from Pecora. After Pecora was unresponsive, Domnister went to the Union office, but he left after waiting for several hours without assistance. (Id. at 182-83.) He received the second grievance form and called Pecora, saying that he needed help with the form and had not received any assistance. Pecora yelled that his car had broken down, which was why he had been unable to attend the meeting with Domnister. (Id. at 183-34.)

Domnister applied for unemployment insurance benefits in or about mid-January 2003, and Greenbaum advised Domnister by letter that ETS considered Domnister to have voluntarily abandoned his job. (Greenbaum Aff. ¶¶ 34-35.) Domnister did not reply to the letter. (Greenbaum Aff. ¶ 36; Pecora Aff. ¶ 9.) Defendants claim that at no time during his employment did Domnister: 1) file a grievance regarding the circumstances surrounding his termination at ETS; 2) discuss the issue of union contracts with any of the Defendants; or, 3) complain to any of the Defendants that he believed he was being discriminated against based on his national origin or his place of birth or retaliated against for union activity or for complaining about discriminatory behavior. (Greenbaum Aff. ¶ 67; S. Edelman Aff. ¶¶ 8, 10; M. Edelman Aff. ¶¶ 12, 15.) Domnister, however, claims that he had complained to Pecora and Greenbaum on November 25, 2002, that he was being discriminated against by having been paid less money than the EA drivers. He further claims that Pecora had responded that he would try to sort it out but did not do so. (Domnister Dep. at 126, 176-77.) Domnister did not file a grievance regarding the circumstances surrounding the termination of his employment with ETS.

11

(Greenbaum Aff. ¶ 64; Domnister Dep. at 67, 152; Pecora Aff. ¶¶ 9, 14.) Domnister claims that he did not do so because Pecora did not make any of the meetings they had scheduled to discuss his termination. (Domnister Dep. at 64-66, 149-50, 153.)

## Plaintiff Yuldashev

Yuldashev began his employment as a driver at ETS in or about December 1999, and he voluntarily resigned his employment in or about June 2002 to take a job with the New York City Housing Authority. (Greenbaum Aff. ¶¶ 16-17; Yuldashev Dep. at 11, 21-22.) Although Defendants state that Yuldashev did not discuss the issue of union contracts with any of the Defendants (S. Edelman Aff. ¶¶ 8, 10; M. Edelman Aff. ¶ 12), Plaintiffs claim that he had asked Perchenok on several occasions for a copy of the CBA prior to the end of his employment but was never shown it (Yuldashev Dep. at 17.) According to Defendants, at no time during his employment did Yuldashev: 1) file a grievance regarding the circumstances surrounding his termination at ETS; 2) discuss the issue of union contracts with any of the Defendants; or, 3) complain to any of the Defendants that he believed he was being discriminated against based on his national origin or his place of birth or retaliated against for union activity or for complaining about discriminatory behavior. (Greenbaum Aff. ¶ 66; S. Edelman Aff. ¶¶ 8, 10; M. Edelman ¶¶ 12, 15.) Plaintiffs claim that Yuldashev had spoken with Perchenok many times about the fact that ETS employees' salary was lower than that of EA employees and that Perchenok had relayed a message from Greenbaum that if Yuldashev did not like the situation, then he should leave. (Yuldashev Dep. at 29-30, 32-33.)

## Plaintiff Sitnikov

Sitnikov began working as a driver for ETS in October 1999. (Greenbaum Aff. ¶ 49;

12

Sitnikov Dep. at 12.) Defendants claim that complaints by other employees were leveled against Sitnikov. (Greenbaum Aff. ¶¶ 50-61; Sitnikov Dep. at 21.) Plaintiffs counter that any employment problems Sitnikov may have had were retributive and occurred after he had brought a copy of the EA 1998 CBA to his employers.[9] (Sitnikov Aff. ¶¶ 1, 4.) On March 28, 2003, Perchenok informed Sitnikov that he was suspended for the day.[10] (Sitnikov Dep. at 24.) Defendants claim that Sitnikov was fired for refusing to pick up the passengers assigned to him. (Greenbaum Aff. ¶ 62.) Defendants state that Sitnikov then went to Greenbaum's office, accompanied by Lerner to serve as a translator, and inquired about why he had been suspended. (Id.) After Greenbaum explained the problem with Sitnikov's behavior, Sitnikov threatened to call the Labor Department and stormed out of the office, yelling in Russian to Edward Perchenok, an ETS Dispatcher who sat in an adjacent office. (Id. ¶¶ 8, 62) Perchenok appeared to be offended; both he and Lerner then explained to Greenbaum that Sitnikov had said that he was going to get a grenade launcher and kill Perchenok. (Id. ¶ 62) Greenbaum then fired Sitnikov. (Id.) Plaintiffs deny these allegations and state that Lerner did not speak English and could not have served as a translator. (Sitnikov Aff. ¶¶ 1, 4.)

Defendants further claim that at no time during his employment did Sitnikov: 1) file a grievance regarding the circumstances surrounding his termination at ETS; 2) discuss the issue of union contracts with any of the Defendants; or, 3) complain to any of the Defendants that he

---

[9]Sitnikov stated that copies of the ETS 1999 CBA were available in the driver's lounge as of the fall of 2002. (Sitnikov Dep. at 36-27.)

[10]Plaintiffs deny this statement but provide no citation to the record. (Plaintiffs' First Response at ¶ 82.) Therefore, the court deems Defendants' statement to be true. See Giannullo, 322 F.3d at 140.

believed he was being discriminated against based on his national origin or his place of birth or retaliated against for union activity or for complaining about discriminatory behavior. (Greenbaum Aff. ¶¶ 64, 66-67; S. Edelman Aff. ¶¶ 8, 10; M. Edelman Aff. ¶¶ 12, 15; Pecora Aff. ¶ 14; Sitnikov Dep. at 30-31.) Plaintiffs assert that Sitnikov complained many times to Perchenok. Perchenok told Sitnikov that if he did not like the way in which he was being treated, there were other Russians waiting to take his position. (Sitnikov Aff. ¶ 12.)

## Plaintiff Mishchenko

Mishchenko began working as a driver for ETS in or about April 1999. (Greenbaum Aff. ¶ 37; Mishchenko Dep. at 12.) In December 2002, Mishchenko requested to change his work schedule so that he would work no more than forty hours per week while his wife underwent surgery. (Greenbaum ¶ 38; Mishchenko Dep. at 19, 29; Mishchenko Aff. ¶ 6.) Thereafter, ETS offered Mishchenko a schedule that would require him to work no more than eight hours per day, though he would have had to report to work three times per day in order to make his scheduled runs.[11] (Greenbaum Aff. ¶ 38; Mishchenko Dep. at 30.) Defendants allege that on January 15, 2003, Mishchenko told Perchenok that he was leaving early because he had worked his forty hours for the week. (Greenbaum Aff. ¶ 40.) Plaintiffs claim that on that date, Mishchenko had a fever. He told Perchenok that he had to leave work early because he was ill and had to go to a doctor's appointment at 4:00 p.m. (Mishchenko Aff. ¶¶ 7-8.)

Mishchenko was scheduled to work at 7:00 a.m. on January 16, 2002, but did not do so.

---

[11]Plaintiffs state that "the hours were unreasonable because those were the times he was needed most for his children and to report to work three time a day, he would barely get home before he would be required to return to work." (Plaintiffs' First Response at ¶ 82.) Plaintiffs provide no support for this statement in the record, however, and therefore the court does not consider it as part of the factual record.

(Greenbaum Aff. ¶ 41.) Plaintiffs claim that he was unable to work because he was very ill and did not wake up in time to call the office. (Mishchenko Aff. ¶¶ 7-8.) He arrived at work at 10:15 a.m., and Perchenok told him that he was in violation of the ETS 1999 CBA by dictating his own schedule. (Greenbaum Aff. ¶ 41.) Perchenok told Mishchenko that he could speak with Greenbaum at 4:00 p.m. to discuss the situation. (Id.) Defendants allege that Mishchenko went to speak to Greenbaum at or around 4:00 p.m. that day, and Greenbaum told Mishchenko that he was not permitted to dictate his own schedule and that any future refusal to comply with the rules would be considered a resignation on his part. (Id. at 42.) Greenbaum offered Mishchenko either a schedule whereby he would solely work on the weekend, so that he could schedule doctors' appointments during the week, or, in the alternative, a leave of absence from work. (Id.; Mishchenko Dep. at 30.)

On or about January 20, 2003, Mishchenko asked whether he would be able to collect unemployment benefits if he took a leave of absence; Greenbaum said that he would not. (Greenbaum Aff. ¶ 43.) According to Defendants, on January 21, 2003, Mishchenko told Perchenok that he intended to stop working at 3:00 p.m. on the following day, since the union contract only required him to work forty hours per week. (Greenbaum Aff. ¶ 44.) According to Plaintiffs, Mishchenko left work early, explaining to Perchenok that he had a doctor's appointment. (Mishchenko Aff. ¶ 7.)

The following day, Mishchenko entered Perchenok's office, gave Perchenok his keys, told Perchenok he was done and that he was leaving. (Id. ¶ 45; Mishchenko Dep. at 31.) On January 22, 2003, Mishchenko left work before the end of his shift. (Greenbaum Aff. ¶ 45; Mishchenko Dep. at 31-32.) Mishchenko told Perchenok that he had a doctor's appointment at

15

5:00 p.m. and so he had to leave work at 4:00 p.m. (Mishchenko Dep. at 31-32.) Later that day, Mishchenko's wife, Zhanna, called Pecora and told him that her husband had been discharged by ETS because he had gone to see a doctor. (Pecora Aff. ¶ 10; Z. Mishchenko Aff. ¶ 1-5.)

On January 23, 2003, Mishchenko did not come to work. Later that day, he and his sister-in-law went to see Greenbaum in his office. The sister-in-law asked Greenbaum to be considerate of Mishchenko's situation, Greenbaum replied that he had been, and then refused to speak with them any further. (Greenbaum Aff. ¶ 47; Mishchenko Dep. at 31-35.) Mishchenko had a doctor's note to explain his absences, but Greenbaum said that Mishchenko was fired and that Greenbaum did not wish to speak to him. (Mishchenko Aff. ¶¶ 6-9.)

The doctor had written on the note that Mishchenko could return to work on January 27, 2003. He attempted to do so, but was not permitted by ETS to continue working. (Mishchenko Dep. at 34-35.) Perchenok told him that ETS considered him to have abandoned his job. (Greenbaum Aff. ¶ 48.) Defendants claim that Mishchenko produced a doctor's note, which was dated January 22, 2003, only after he had been told that he was no longer permitted to work at ETS. (Greenbaum Aff. ¶ 48, Ex. M; Mishchenko Dep. at 35.)

On January 23, 2003, Pecora received from Union President Lori Ames a letter signed by Mishchenko dated January 22, 2003 which questioned why the EA 1998 CBA was not applicable to him. (Pecora Aff. ¶ 11, Ex. 3.) In response, Pecora wrote a letter advising Mishchenko to file a grievance, and he enclosed a grievance form. (Id. ¶ 12.) Neither Mishchenko nor his wife ever responded to Pecora's letter. (Id.) Plaintiffs contend that Mishchenko called Pecora, but that Pecora never returned the calls seeking help with questions about how to proceed. (Mishchenko Aff. ¶ 10; Z. Mishchenko Aff. ¶ 3.)

16

Pecora continued to investigate and heard from Greenbaum that Mishchenko had given his keys to the dispatcher, told the dispatcher that he was "done" and left the job site, despite having been advised that ETS would discharge him if he did so. (Pecora Second Aff. ¶ 17; Greenbaum Affidavit submitted by Union Defendants ("Greenbaum Second Aff.") ¶ 9.)

Defendants further assert that at no time during the course of his employment did Mishchenko: 1) file a grievance regarding the circumstances surrounding his termination at ETS; 2) discuss the issue of union contracts with any of the Defendants; or, 3) complain to any of the Defendants that he believed he was being discriminated against based on his national origin or his place of birth or retaliated against for union activity or for complaining about discriminatory behavior. (Greenbaum Aff. ¶¶ 64, 67; Pecora Aff. ¶ 14; S. Edelman Aff. ¶¶ 8, 10; M. Edelman Aff. ¶¶ 12, 15.) Plaintiffs claim that Mishchenko filed a grievance to the Union president, who in turn told him that Pecora would investigate and follow-up. Pecora never did so, however. (Mishchenko Dep. at 63-64.) Mishchenko did not file any additional forms because he believed that he was no longer in the Union and did not have a contract in effect for 2002. According to Mishchenko, Pecora did not explain that the Union would represent him, despite not having a contract. (Id. at 52-54.) Plaintiffs further claim that Mishchenko complained that he had been discriminated against based on national origin when he asked Perchenok why the EA 1998 CBA applied only to American-born employees. (Mishchenko Aff. ¶¶ 3, 5.)

**Plaintiff Murkametdinov**

Murkametdinov began his employment as a driver for ETS on or about August 1, 2000. (Greenbaum Aff. ¶ 19; Murkametdinov Dep. at 10-12.) In or about July 2002, Murkametdinov asked Greenbaum to change his schedule to allow him to work fewer hours so that he could study

for his medical board examinations and because of health-related problems such as high blood pressure.[12] (Greenbaum Aff. ¶ 20; Murkametdinov Dep. at 27.) Greenbaum thereafter advised Murkametdinov that ETS could not accommodate his request. (Greenbaum Aff. ¶ 21; Murkametdinov Dep. at 30-31.) In September 2002, Murkametdinov spoke with Domnister about contacting the union. Domnister replied that he wanted to get a copy of the contract explaining the terms under which they worked. (Murkametdinov Dep. at 32.)

Defendants state that Murkametdinov resigned his position on September 14, 2002. (Greenbaum Aff. ¶ 21.) Plaintiffs claim that he did not resign. Rather, he came to work for two straight days but was not given a vehicle to drive and was not paid for those days. On the third day, he called unemployment. (Murkametdinov Aff. ¶ 5; Murkametdinov Dep. at 24.) At no time during his employment did Murkametdinov: 1) file a grievance regarding the circumstances surrounding his termination at ETS; 2) discuss the issue of union contracts with any of the Defendants; or, 3) complain to any of the Defendants that he believed he was being discriminated against based on his national origin or his place of birth or retaliated against for union activity or for complaining about discriminatory behavior. (Greenbaum Aff. ¶¶ 64, 66-68; Pecora Aff. ¶ 14; Murkametdinov Dep. at 23-24; S. Edelman Aff. ¶¶ 8, 10; M. Edelman Aff. ¶¶ 12, 15.)

## II.    Claims

Plaintiffs brought suit against Exclusive Defendants and Union Defendants, alleging that: 1) Union Defendants breached their duty of fair representation by failing to urge ETS to apply the terms of the EA 1998 CBA to ETS employees based upon Article 22A of that CBA, which

---

[12]Defendants claim that he had asked to be allowed to leave at 3:00 p.m. each day (Greenbaum Aff. ¶ 20), and Plaintiffs state that he had simply asked to work fewer hours during the week (Murkametdinov Aff. ¶ 2).

provided that the CBA would "apply to all establishments now or hereafter owned, operated or controlled by the Employer"; 2) Exclusive Defendants retaliated against Plaintiffs for their participation in Union activities in violation of the NLRA; 3) Exclusive and Union Defendants discriminated against Plaintiffs on the basis of their Russian national origin by breaching the terms of the EA 1998 CBA in violation of NYSHRL; 4) Exclusive Defendants retaliated against Plaintiffs in violation of NYSHRL for complaining about the different terms and conditions of their employment; 5) Exclusive and Union Defendants discriminated against Plaintiffs on the basis of their Russian national origin by breaching the terms of the EA 1998 CBA in violation of NYCAC; and, 6) Exclusive Defendants retaliated against Plaintiffs in violation of NYCAC for complaining about the different terms and conditions of their employment.

## III.    Legal Analysis

### A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "A fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz, 258 F.3d at 69 (internal quotations and citations omitted).

The moving party bears the burden of establishing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party

19

has met this burden, then the non-moving party has the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmovant can create a genuine issue of material fact only by citing competent, admissible evidence. Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) (citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

## B. Preemption

Exclusive Defendants argue that Plaintiffs' third (discrimination based on national origin under the NYSHRL) and fifth (discrimination based on national origin under the NYCAC) claims brought under state law are preempted by Section 301 of the LMRA, 29 U.S.C. § 185. (Memorandum of Law in Support of Exclusive Defendants' Motion for Summary Judgment ("Exclusive Mem.") at 4-7.) Plaintiffs contend that to extend the preemption doctrine to this case would "give such expansive interpretation to the LRMA [sic] that each time an employer has a Union, any issue relating to employment would be pre-empted."[13] (Plaintiffs Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Mem.") at 8.)

Section 301 of the LMRA provides for federal jurisdiction over "suits for violation of

---

[13] The court notes, however, that in arguing that this court has jurisdiction to hear their claims, Plaintiffs state that "[t]here is no doubt that the substance of the[] allegations in this Complaint aptly raise a section 301 of the Labor Management Relations Act (LMRA) mixed claim under 29 .U.S.C.S [sic] § 185(a)." Plaintiffs' Mem. at 7.

contracts between an employer and a labor organization representing employees." The "preemptive force" of Section 301 is "so extraordinary" that any claim based on state law it preempts will be considered a federal claim removable to federal court. Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987) (internal quotations omitted).

A claim is preempted by Section 301 only when one of the elements of the claim requires interpretation of the CBA. Foy v. Pratt & Whitney Group, 127 F.3d 229, 233 (2d Cir. 1997); Hawaiian Airlines, 512 U.S. at 260-62. In making that determination, "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Livadas v. Bradshaw, 512 U.S. 107, 124 (1994) (internal citations omitted). Rather, "Section 301 preemption applies only when necessary 'to assure that the purposes animating 301 will be frustrated neither by state laws purporting to determine questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement . . . .'" Foy, 127 F.3d at 233 (quoting Livadas, 512 U.S. at 122-23).

Here, Plaintiffs' third and fifth causes of action allege violations of NYSHRL and the NYCAC. To prevail on these claims, Plaintiffs must show that: 1) they are members of a protected class; 2) they satisfactorily performed the duties of their positions; 3) they suffered an adverse employment action; and, 4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. McDonnell Douglas Corp. v. Ocean, 411 U.S. 792 (1973).

With respect to the third element, Plaintiffs allege in their Complaint that Defendants breached the EA 1998 CBA by failing to apply its terms to ETS employees. (Amended

Complaint ¶ 27.) Specifically, Plaintiffs contend that they were entitled to its provisions by virtue of Article 22A of the EA 1998 CBA, which provided that the CBA "shall be binding upon the parties hereto, their successors and assigns, and shall apply to all establishments now or hereafter owned, operated or controlled by the Employer." (Plaintiffs' Response to Defendants' First Set of Interrogatories, No. 6; M. Edelman Aff. Ex. A ¶ 22) Plaintiffs argue that Defendants' failure to interpret that provision to mean that it applied to Plaintiffs was an adverse employment action. Thus, the claims necessarily involve "interpretation" of the CBA in order to determine whether Plaintiffs were, in fact, entitled to be covered by the provisions of the EA 1998 CBA. Plaintiffs' third and fifth causes of action are thereby preempted by Section 301. Consequently, as Defendants contend (Union Mem. at 15-16; Exclusive Mem. at 8-9) and as Plaintiffs do not contest,[14] Plaintiffs' claims against the Exclusive Defendants under Section 301 and their claim against the Union Defendants for breach of the duty of fair representation combine to create a "hybrid" cause of action. See DelCostello v. Teamsters, 462 U.S. 151, 163-66 (1983)

## C.    Jurisdiction

Union Defendants claim that this court does not have subject-matter jurisdiction over any of the claims because the Complaint does not state a federal cause of action. (Memorandum of Law in Support of Defendants Pecora's and Local 455's Motion for Summary Judgment ("Union

---

[14] Indeed, although Plaintiffs never specifically respond to Defendants' arguments that Plaintiffs claims combine to form a hybrid Section 301/duty of fair representation claim, Plaintiffs' arguments responding to other points seem to suggest that they concur with this analysis. See Plaintiffs' Mem. at 7 ("There is no doubt that the substance of the[] allegations in this Complaint aptly raise a section 301 of the Labor Management Relations Act (LMRA) *mixed claim* under 29 .U.S.C.S [sic] § 185(a).") (emphasis added), 17-19 (arguing that because the Union Defendants breached their duty of fair representation, Plaintiffs were not required to file a grievance pertaining to their breach of contract claim).

22

Mem.") at 13-14.) They note that the Complaint solely alleges that Union Defendants breached their "fair duty of representation." (Amended Complaint ¶¶ 1, 35.) Union Defendants argue that Plaintiffs have thus "failed to plead or otherwise assert that this Court has jurisdiction pursuant to Section 301," and that the court must dismiss the case. (Union Mem. at 13-14.)

Because Section 301 preempted Plaintiffs' state claims, however, the claims "may properly be removed to the federal courts, even when the plaintiff's complaint does not itself include a federal cause of action." Shafii v. British Airways, PLC, 83 F.3d 566, 569 (2d Cir. 1996) (citing Hawaiian Airlines, 512 U.S. at 253-263).

Next, Defendants contend that Plaintiffs' second cause of action is not reviewable by this court because it is based upon Plaintiffs' termination "for Union activities in violation of the NLR[A]."[15] (Exclusive Mem. at 16-17) (quoting Plaintiffs' Amended Complaint at ¶ 37.) Specifically, they argue that the NLRB has exclusive jurisdiction to hear this claim because Plaintiffs allege a violation of Section 8 of the NLRA.

In their Complaint, Plaintiffs state as the basis of their second cause of action that they were retaliated against for "ask[ing] that the provision of a contract they honestly believed covered them be applied to them." Amended Complaint ¶ 37. Plaintiffs' claim does, in fact, invoke a violation of Section 8 of the NLRA, which prohibits "unfair labor practices" that "interfere with or obstruct" the right to bargain collectively with their employers. 29 U.S.C. §§

---

[15] Although the Amended Complaint states, "NLRB," it is clear from the totality of the Amended Complaint that Plaintiffs intended to found their claim upon a violation of the NLRA. See Amended Complaint ¶¶ 1 (stating that Plaintiffs "wanted the terms of the [CBA] enforced . . . under the National Labor-Management Relations Act of 1947 as amended (NLRA)"), 2 ("Plaintiffs seek . . . relief pursuant to NLRA, the Human Rights Law, and the City Law."), 3 ("Jurisdiction of the subject matter of this action is established in this court by NLRA, as amended.").

158, 159.

> It is axiomatic that:
>
> When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 254 (1959). Because Plaintiffs' second cause of action is arguably subject to Section 8 of the NLRA, exclusive jurisdiction to hear that claim resides with the NLRB. Defendants' motion to dismiss Plaintiffs' second cause of action is therefore GRANTED.

### D. Union Defendants' Breach of Fair Duty of Representation

#### a. Defendant Pecora

The Supreme Court has long held that "union agents" are not personally liable for acts performed on the union's behalf. See Atkinson v. Sinclair Refining Co., 370 U.S. 238, 247-49 (1962), overruled in part on other grounds by Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 241 (1970). It is also well-settled in this circuit that individual union members are specifically immune from suits for breach of the duty of fair representation. Morris v. Local 816, 169 F.3d 782, 784 (2d Cir. 1999). Because union officers and employees are not individually liable for acts performed as representatives of the union, Plaintiffs do not have any recourse against Pecora for the claim of breach of fair representation. Plaintiffs' cause of action lies only against the Union. Accordingly, Pecora's motion for summary judgment is GRANTED, and Plaintiffs' claim against Pecora is dismissed.

24

### b.    Defendant Union

Judicial review of union action "must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." Spellacy v. Airline Pilots Ass'n, Int'l, 156 F.3d 120, 126 (2d Cir. 1998), (quoting Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100, 1106 (2d Cir. 1991)). "Congress envisioned the relationship between the courts and the labor unions as similar to that between the courts and the legislature." Airline Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 78 (1991). Accordingly, a court may not substitute its own view of the proper bargain for that reached by the union. Id.

A claim for breach of the duty of fair representation requires a showing that a union's "conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998) (citing Vaca v. Sipes, 386 U.S. 171 (1967)); see also O'Neill, 499 U.S. at 67. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." Id. (quoting Ford Motor Co. v. Huffman, 345 U.S. at 338.) "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez, 525 U.S. at 45-46. A showing of "[b]ad faith requires a showing of fraudulent, deceitful, or dishonest action." Sim v. New York Mailers' Union No. 6, 166 F.3d 465, 472 (2d Cir. 1999); see also Spellacy, 156 F.3d at 126 ("A union acts in bad faith when it acts with an improper intent, purpose, or motive . . . . Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct."); White v. White Rose Food, a Div. of DiGiorgio Corp., 237 F.3d 174, 179 (2d Cir. 2001) (same). To survive a motion for summary judgment, a plaintiff alleging a breach

of the duty of fair representation must "set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty or arbitrary exercise of discretion." Ramey v. District 141, Int'l Ass'n of Machinists and Aerospace Workers, No. 99-CV-4341 (ERK), 2002 WL 32152292, *9 (E.D.N.Y. November 4, 2002); Echeverri v. Starrett City, Inc., No. 96-CV-1006 (JG), 1998 WL 903482, *7 (E.D.N.Y. December 7, 1998); Spielmann v. Anchor Motor Freight, 551 F. Supp. 817, 822 (S.D.N.Y.1982).

In the case at bar, Plaintiffs allege that the Union acted arbitrarily, discriminatorily and/or in bad faith by failing, in the course of their contract negotiations, to compel Exclusive Defendants to apply the terms of the EA 1998 CBA to the ETS employees. The Union claims that as a matter of law, they could not compel ETS to "accrete" Plaintiffs into the EA 1998 CBA because ETS employees outnumbered EA employees, there was "virtually no interchange of employees and the ETS Brooklyn facility was autonomous from the EA facility and served a separate function from the EA facility." (Union Mem. at 19-20.)

The accretion doctrine "ordinarily applies to new employees who have common interests with members of an existing bargaining unit and who would have been included in the certified unit or are covered by a current [CBA]." Rennaissance Center Partnership, 239 NLRB 1247 (1979). The criteria used to determine whether employees should be accreted into an existing bargaining unit without an election include: "geographic proximity, similarity of skills and functions, similarity of conditions of employment, centralization of the employer's administration, managerial and supervisory control, interchange between the employees, functional integration of the employer, and bargaining history." NLRB v. Stevens Ford, Inc., 773 F.2d 468, 473 (2d Cir. 1985). An additional factor to be considered is whether the employees to

be accreted outnumber those in the original bargaining unit. Rennaissance, 239 NLRB at 1247-48. The Union argues that ETS employees met none of these characteristics, and that therefore the Union could not have compelled Exclusive Defendants to accrete. (Union Mem. at 18-20.)

The NLRB is responsible for determining whether employees may be accreted into existing units. South Prairie Construction Co. v. Local 627, Int'l Union of Operating Engineers, 425 U.S. 800, 805 (1976) (per curiam). Therefore, the court does not decide whether Plaintiffs should have been accreted, or should have been the subject of an election, but rather whether such failures constitute evidence that the Union acted arbitrarily, discriminatorily, and/or in bad faith.

The duty of fair representation does not require that a union achieve absolute equality among its members. Ramey, 2002 WL 32152292, at *9. Rather, because a union by necessity must differentiate among its members in a variety of contexts, see Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1956), a showing that union action has disadvantaged a group of members, without more, does not establish a breach of the duty of fair representation because such action was arbitrary. Ramey, 2002 WL 32152292, at *9, citing Humphrey v. Moore, 375 U.S. 335, 349 (1964) ("[W]e are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another"). Actions taken by a union that disadvantage one group of constituents as opposed to another are permissible provided there is a legitimate, rational reason for the union's conduct. See, e.g., O'Neill, 499 U.S. 65 (holding that where strike settlement imposed terms that turned out to be worse than what would have been if there was no settlement, union's action was not arbitrary in

27

light of the rational reasons relating to interests of union members for entry into the settlement at that time); Haerum, 892 F.2d 216 (holding that where union enunciated rational reasons for not placing pilots from acquired airline higher on seniority list, action of union was not arbitrary so as to make out claim for breach of duty of fair representation); Spellacy, 156 F.3d 120 (holding that where proof at trial established rational, practical reasons relating to running of airline for decision relating to retraining of pilots that disadvantaged one group of union constituents – those from a formerly separate airline – verdict for plaintiffs would be overturned).

Here, the facts adduced by Plaintiffs to establish that the Union acted arbitrarily, discriminatorily, and/or in bad faith, are that 1) the Union failed to achieve terms and conditions of employment comparable to those covering the employees at EA, despite the existence of Article 22A, and 2) Plaintiffs were all of Eastern European national origin whereas EA employees were not. The Union contends that Plaintiffs have not established that the Union breached its duty of fair representation because the Union has provided a rational reason for its failure to have the terms and conditions which applied to EA employees apply to Plaintiffs – namely, that they believed that they could not feasibly make an accretion argument to Exclusive Defendants when negotiating their CBA.

The Union is correct. Plaintiffs have failed to produce any evidence to the court [*] regarding steps the Union could have taken, but did not, to attempt to have Plaintiffs covered by the more favorable terms of the EA 1998 CBA. And, Plaintiffs failed to provide any response to the Union's argument that the Union believed accretion to be impossible. (See Plaintiffs' Mem. at 17-19.) Without more information, no rational jury accepting the facts presented by Plaintiffs to be true could find that the Union acted arbitrarily, discriminatorily or in bad faith by simply

28

negotiating a less favorable CBA for ETS employees than EA employees. Because it is Plaintiffs' duty to present facts to the court tending to establish the Union's motivation during the negotiation process which lead to the disparate outcome at issue, because the Union provided a legitimate rationale for their actions in negotiating the CBA, and because the court's review "must be highly deferential" to the bargaining process, see Spellacy,156 F3d at 126, I find that Plaintiffs have not met their burden. The Union's motion for summary judgment is GRANTED, and the claims against the Union are dismissed.

### E. Exclusive Defendants' Breach of the EA 1998 CBA

Proof of a hybrid Section 301/duty of fair representation claim requires proof of violations by both the union and the employer. See DelCostello, 462 U.S. at 165. Consequently, Plaintiffs' failure to establish their duty of fair representation claim against the union means that their hybrid claim against Exclusive Defendants necessarily fails as well. See White, 237 F.3d at 183. Thus, Plaintiffs' claims against Exclusive Defendants must fail, and Exclusive Defendants' motion for summary judgment is GRANTED.

## IV. CONCLUSION

For the reasons stated above, Pecora's motion for summary judgment is GRANTED, the Union's motion for summary judgment is GRANTED, and Exclusive Defendants' motion for summary judgment is GRANTED. The court declines to exercise jurisdiction over claims four

and six and refers them to the state courts for adjudication. Plaintiffs' Complaint is hereby dismissed, and the Clerk of Court is directed to close the case.

SO ORDERED.

Dated: November 27, 2007
      Brooklyn, N.Y.

/signed/
_____
NICHOLAS G. GARAUFIS
United States District Judge